UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| FIRST DAKOTA NATIONAL BANK,<br><br>Plaintiff,<br><br>vs.<br><br>JEROME N. RUBA, a/k/a JERRY RUBA,<br><br>Defendant. | 4:16-CV-04007-RAL<br><br><br>OPINION AND ORDER ON<br>PENDING MOTIONS |
| JEROME N. RUBA, a/k/a JERRY RUBA,<br><br>Counter Plaintiff,<br><br>vs.<br><br>FIRST DAKOTA NATIONAL BANK,<br><br>Counter Defendant. | |
| JEROME N. RUBA, a/k/a JERRY RUBA,<br><br>Third-Party Plaintiff,<br><br>vs.<br><br>BAILEY RIDGE PARTNERS, LLC; JACK GRUBB; NICOLE GRUBB-NEARMAN; JASON GRUBB; GRUBB FAMILY PARTNERSHIP; FLOYD C. DAVIS; VERLYN NAFE; FRANK MANTHEI; and PAUL ENGLE,<br><br>Third-Party Defendants. | |

## I. Claims, Procedural History, and Pending Motions

First Dakota National Bank (First Dakota) filed this case claiming that Defendant/Third-Party Plaintiff Jerome N. Ruba (Ruba) had breached a loan agreement for $500,000 and owed First Dakota principal and interest. Doc. 1. First Dakota is a bank based in Yankton, South Dakota; Ruba is an Iowa citizen; federal jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. Doc. 1.

Ruba filed an answer, counterclaim, and third-party complaint. Doc. 7. Ruba then filed a first amended third-party complaint, Doc. 10, and most recently an amended answer, counterclaim, and second amended third-party complaint, Doc. 105. Ruba acknowledges signing the $500,000 note in favor of First Dakota, but maintains that it was part of a loan package to Bailey Ridge Partners, LLC (Bailey Ridge), a hog confinement business in Iowa. Doc. 7 at ¶ 6; Doc. 105 at ¶ 6. Ruba in his counterclaim alleged misrepresentation by First Dakota about Bailey Ridge finances. Doc. 7 at 4. Ruba in his amended answer and counterclaim added a second count for illegal tying arrangement under 12 U.S.C. § 1972, claiming that First Dakota abused its power in requiring Ruba to put up collateral for an indebtedness of Bailey Ridge. Doc. 105 at 6–7.

In his third-party complaint and various amendments thereto, Ruba names other owners/members of Bailey Ridge, including Grubb Family Partnership, Floyd C. Davis, Verlyn Nafe, Frank Manthei, and Paul Engle. Docs. 7, 10, 49, 105. Ruba likewise names as Third-Party Defendants the owners of Grubb Family Partnership, including Ruba's brother-in-law Jack Grubb, Nicole Grubb-Nearman, and Jason Grubb (collectively with Grubb Family Partnership "the Grubb Defendants"). Docs. 7, 10, 49, 105. The second amended third-party complaint[1] has five claims:

---

[1] There actually are two different pleadings filed by Ruba labeled second amended third-party complaint, Docs. 47 and 105. This Court refers to the later version of the third-party complaint that added fraud claims as the second amended third-party complaint. See Doc. 105.

1) breach of contract against Bailey Ridge for the $500,000 First Dakota loan that Ruba obtained but that went to fund Bailey Ridge; 2) breach of a memorandum agreement dated July 11, 2013 against all Third-Party Defendants; 3) breach of a promissory note against Bailey Ridge for a $664,581.30 promissory note executed by Bailey Ridge in favor of Ruba; 4) "fraud and/or material misrepresentation" against all Third-Party Defendants; and 5) minority oppression against Bailey Ridge and the Grubb Defendants. Doc. 105.

Only one Third-Party Defendant—Floyd C. Davis—filed a counterclaim against Ruba. That counterclaim pleaded claims of breach of contract, breach of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment. Doc. 109. None of the pending motions relate to Davis's counterclaim against Ruba.

First Dakota filed this case in 2016. On December 21, 2016, this Court entered an Opinion and Order granting Ruba's motion for partial summary judgment against Bailey Ridge for the $664,581.30 promissory note, plus interest. This case then was delayed by Bailey Ridge's bankruptcy filing in the Northern District of Iowa. Docs. 80, 81, 86. After proceedings resumed in this Court and after Ruba filed his amended answer, counterclaim, and second amended third-party complaint, the parties filed the following motions: 1) Third-Party Defendants Paul Engle and Verlyn Nafe's motion to dismiss fraud claim, Doc. 111; 2) Third-Party Defendant Floyd Davis's motion to dismiss fraud claim, Doc. 113; 3) Bailey Ridge and the Grubb Defendants' motion to dismiss fraud claim, Doc. 115; 4) Bailey Ridge and the Grubb Defendants' motion for summary judgment, Doc. 121; 5) First Dakota's motion for summary judgment, Doc. 126; 6) Third-Party Defendants Nafe, Engle, and Davis's joint motion for partial summary judgment, Doc. 131; and quite recently 7) Bailey Ridge and the Grubb Defendants' motion for leave to file supplemental brief in support of summary judgment, Doc. 151.

3

Rather than ruling separately and perhaps more promptly on the motions to dismiss the fraud claims, this Court allowed the briefing on all pending motions to be completed before scheduling a single motion hearing. On August 28, 2019, this Court heard from counsel for all of the parties on all of the pending motions. For the reasons explained herein, the motions to dismiss the fraud claims are granted except as to a fraud claim against Jack Grubb where leave is given for Ruba to plead with greater particularity any such fraud claim. The motion for summary judgment filed by First Dakota is granted. The motion for summary judgment by individual Third-Party Defendants, including the Grubb Defendants, is granted as to Ruba's claims under the memorandum agreement dated July 11, 2013. What then remains of this case—a breach of contract claim against Bailey Ridge which appears not to be contested, a potential fraud claim against Jack Grubb, and a minority oppression claim against Bailey Ridge and the Grubb Defendants—all involve Iowa citizens such that the interests of justice militate against a federal district court in South Dakota retaining supplemental jurisdiction over such claims.

## II.     Motions to Dismiss Fraud Claims

All of the Third-Party Defendants have filed motions to dismiss Count 4 of the second amended third-party complaint alleging "fraud and/or material misrepresentation." Docs. 105, 111, 113, 115. Ruba has filed a voluntary dismissal, agreeing to dismiss without prejudice some of the Third-Party Defendants—Jason Grubb, Davis, Manthei, and Engle, but not Bailey Ridge, Jack Grubb, or Nicole Grubb-Nearman—from the fraud claim. Doc. 120.

Because this case arises under diversity jurisdiction based on First Dakota's claim against Ruba, this Court must apply state substantive law and federal procedural law. Great Plains Tr. Co. v. Union Pac. R.R. Co., 492 F.3d 986, 995 (8th Cir. 2007). Federal procedural law requires allegations of fraud to be pleaded with particularity. Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), the

party alleging fraud "must typically identify the 'who, what, where, when, and how' of the alleged fraud." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007) (quoting United States ex rel. Costner v. U.R.S. Consultants, Inc., 317 F.3d 883, 888 (8th Cir. 2003)). Although a court must accept all factual allegations as true when ruling on a motion to dismiss, a court need not "accept conclusory legal allegations as true." Great Plains Tr. Co., 492 F.3d at 995.

The parties agreed at oral argument that South Dakota law governs the claims between First Dakota and Ruba, but that Iowa law governs the claims of Ruba against the Third-Party Defendants. Under Iowa law, which governs the fraud claims Ruba makes against the Third-Party Defendants, a fraud claim requires a showing of: 1) representation; 2) falsity; 3) materiality; 4) scienter; 5) intent to deceive; 6) reliance; and 7) resulting injury and damage. Grefe v. Ross, 231 N.W.2d 863, 864 (Iowa 1975). The fourth element of scienter and the fifth element of intent to deceive "are closely related and 'are shown not only when the speaker has actual knowledge of the falsity of his representations but also when he speaks in reckless disregard of whether his representations are true or false.'" Beeck v. Aquaslide 'N' Dive Corp., 350 N.W.2d 149, 155 (Iowa 1984) (quoting Grefe, 231 N.W.2d at 867). Under Iowa law, when a statement of intent to perform is coupled with the absence of any intention to perform, there can be a colorable fraud action. City of McGregor v. Janett, 546 N.W.2d 616, 619 (Iowa 1996).

Ruba's second amended third-party complaint generally alleges "fraud and/or material misrepresentation" against all Third-Party Defendants, but makes specific allegations of false and deceitful misrepresentations only against Jack Grubb and Bailey Ridge. Paragraph 36 of the second amended third-party complaint alleges:

> Bailey Ridge and Jack Grubb made false or misleading representations regarding the financial status of Bailey Ridge to induce Mr. Ruba to enter into a loan package agreement with Baily [sic] Ridge and First Dakota.

5

Doc. 105 at ¶ 36. The heart of the fraud allegations in the second amended third-party complaint

is Paragraph 37, which states in full:

> Bailey Ridge and Jack Grubb, directly or through their agents or representatives, continued to make representations regarding repayment and the financial status of Baily [sic] Ridge until Baily [sic] Ridge filed bankruptcy in January 2017. Such representations include:
>
> a.     That Baily [sic] Ridge would buy out Mr. Ruba's interest and/or repay debts owed to him within a matter of weeks;
>
> b.     That Mr. Ruba would receive income from the sale of certain hog sites;
>
> c.     That Ruba would receive a secured interest in certain hog sites or other real estate;
>
> d.     That Mr. Ruba would receive information and updates regarding the financial status and/or decisions of Baily [sic] Ridge;
>
> e.     That Mr. Ruba would receive payments from an overfunded construction project;
>
> f.     That Bailey Ridge would pay First Dakota directly from any source; and
>
> g.     That government payment[2] would be available to pay Mr. Ruba in whole or in part.

Doc. 105 at ¶ 37. Ruba then alleges in Paragraph 39 of the second amended third-party complaint

that neither Bailey Ridge nor its members intended to repay Ruba. Doc. 105 at ¶ 39. The remaining

parts of Count 4—Paragraphs 38, 40, and 41—simply allege damage. Doc. 105 at ¶¶ 38, 40, 41.

Viewing the second amended third-party complaint as a whole, Ruba's claims for fraud and

material misrepresentation fall well short of the Rule 9(b) standard with regard to all Defendants

except Jack Grubb and Bailey Ridge. Typically, allegations of fraud against groups of defendants

are not sufficient without identifying how each individual defendant committed a fraud.

---

[2] The record makes clear that this contention involved discussion of a Small Business Administration loan to Bailey Ridge to pay off the promissory notes to First Dakota apparently including the $500,000 promissory note that Ruba separately signed.

Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC, 781 F.3d 1003, 1013 (8th Cir. 2015) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." (citation omitted)); Trooien v. Mansour, 608 F.3d 1020, 1030 (8th Cir. 2010) ("It is not sufficient to attribute alleged false statements to 'defendants' generally."); Parnes v. Gateway 2000, Inc., 122 F.3d 539, 550 (8th Cir. 1997) (noting plaintiff's failure to particularize fraud when defendants were "left to guess" who was responsible for fraud). Ruba indeed recognizes the shortcomings in his fraud claims in agreeing to dismiss voluntarily some of the named Third-Party Defendants from Count 4. Doc. 120.

As to the claims against Jack Grubb and Bailey Ridge, the second amended third-party complaint alleges the who (Bailey Ridge and Jack Grubb) and the what (the alleged statements contained in Paragraph 37 of the second amended third-party complaint), and the how (misleading Ruba into the financial arrangement where he borrowed money from First Dakota for Bailey Ridge), but lacks the explicit "where" and "when" components of a properly pleaded fraud claim under Rule 9(b). See BJC Health Sys., 478 F.3d at 917. Ruba, in opposing the Grubb Defendants' motions, presented more specific facts of possible fraud by Jack Grubb both relating to some matters pleaded in the second amended third-party complaint and beyond, such as that Jack Grubb told Ruba that the $500,000 that Ruba was injecting (via the loan from First Dakota) into Bailey Ridge would be used to purchase back hog sites from foreclosure, but in reality included payments to Jack Grubb and Nicole Grubb-Nearman, and to settle a lawsuit and for bills allegedly not owed by Bailey Ridge. Doc. 136 at 10–11. A document exists showing that, out of the funds, Jack Grubb received $55,000, Nicole Grubb-Nearman received $35,000, and payments were made elsewhere

to those who may not have been Bailey Ridge creditors or lienholders on Bailey Ridge properties. See Doc. 138-22 at 4.

Under these circumstances, this Court typically would grant Ruba leave to file another amended third-party complaint to satisfy the Rule 9(b) requirements as to Bailey Ridge and Jack Grubb. Dismissal of the fraud claim against remaining Third-Party Defendants is justified. For the reasons explained below, any fraud claim by Ruba against Jack Grubb and Bailey Ridge, however, should be litigated in Iowa state court.

## III. Summary Judgment Motions

### A. Summary Judgment Standard

All but one of the remaining motions in this case seek summary judgment. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007). Summary judgment is not "a disfavored procedural shortcut,

but rather. . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## B. Material Facts in the Light Most Favorable to Ruba

Ruba is the nonmovant and is entitled to have material facts that are in genuine dispute viewed in his favor.[3] Ruba is married to Jack Grubb's sister Lynne Grubb Ruba. Doc. 128 at ¶ 3. Jack Grubb operated a previous hog confinement operation, Maple Grove Farms, LLC, which was in debt to American Bank NA of Le Mars, Iowa. Ruba's parents took a loan from American Bank to help fund Maple Grove. Ruba's mother died in 2002, and his father died in 2006, without receiving repayment from Maple Grove. Doc. 123 at ¶ 1; Doc. 137 at ¶ 1. To avert a family squabble in handling his parents' estate, Ruba personally assumed the obligation to American Bank that was supposed to be paid by Maple Grove. Doc. 123 at ¶¶ 2–4; Doc. 137 at ¶¶ 2–4. Maple Grove then owed Ruba the debt it previously owed to Ruba's parents.

Maple Grove could not service the debt to its primary lender American Bank and had borrowed from First Dakota as well. First Dakota had a secured interest in Maple Grove assets that was subordinate to American Bank's security interest. Ruba's position on what Maple Grove owed him was subordinate to both American Bank and First Dakota's security positions. American Bank initiated foreclosure action on the assets of Maple Grove. During 2010, Jack Grubb sought financing from First Dakota and other potential investors to assist in redeeming Maple Grove properties from foreclosure. Doc. 128 at ¶ 12; Doc. 145 at ¶ 12. Jack Grubb introduced Ruba to a

---

[3] This Opinion and Order takes the facts primarily from portions of the movants' statements of undisputed material facts, Docs. 123, 128, 132, which Ruba does not dispute in his responses, Docs. 137, 142, and from other matters of record not genuinely disputed. This Court of course is not making any findings of fact.

First Dakota loan officer in Yankton, South Dakota.  Doc. 128 at ¶ 4; Doc. 142 at ¶ 4.  During this time Ruba was represented by counsel Patrick Murphy of Murphy, Collins & Bixenmann, Prof. LLC, of Le Mars.  Doc. 128 at ¶ 9; Doc. 142 at ¶ 9.  Jack Grubb used separate legal counsel David Updegraff.  Some potential investors proposed to invest by contributing additional hog sites and did invest in that manner.  Doc. 128 at ¶ 13; Doc. 142 at ¶ 13.  Ruba, who had been farming in Iowa for 35 years and had accumulated a substantial net worth, Doc. 128 at ¶¶ 5–7; Doc. 142 at ¶¶ 5–7, was considered to be a potential cash investor in the new entity, Bailey Ridge.  Doc. 128 at ¶ 14; Doc. 142 at ¶ 14.  Regarding potential investment in Bailey Ridge, Ruba's attorney Murphy advised Ruba to be conservative, advised him of potential problems with various investment proposals received from Jack Grubb, and advised Ruba of risks of "doubling down" on debt he was owed from Jack Grubb's business.  Doc. 128 at ¶ 15; Doc. 142 at ¶ 15.  Ruba knew that the properties of Jack Grubb's business were in foreclosure.  Doc. 123 at ¶ 8; Doc. 137 at ¶ 8.

Ruba, Bailey Ridge, and other Bailey Ridge members executed a $100,000 promissory note to First Dakota on December 30, 2010.  Doc. 123 at ¶ 10; Doc. 137 at ¶ 10.  Ruba granted First Dakota a mortgage to secure the $100,000 loan.  Doc. 123 at ¶ 11; Doc. 137 at ¶ 11.  When his deposition was taken, Ruba did not recall anything about the $100,000 note from First Dakota, which appears to have been to cover short-term expenses for Bailey Ridge or as bridge financing in advance of First Dakota's later lending to fund Bailey Ridge.  Doc. 123 at ¶¶ 12–13; Doc. 137 at ¶¶ 12–13.  There are no claims in this lawsuit concerning the $100,000 note from December of 2010.

The discussions among Jack Grubb, Ruba, investors in Bailey Ridge, and First Dakota came to a culmination with a series of agreements dated March 24, 2011.  Doc. 123 at ¶¶ 15–28; Doc. 137 at ¶¶ 15–28.  On March 24, 2011, First Dakota loaned $5.6 million to Bailey Ridge for

redemption of the properties in foreclosure and to fund Bailey Ridge. As a condition to First Dakota lending the $5.6 million, members of Bailey Ridge, including Ruba, signed the promissory note. The $5.6 million loan is not directly at issue in this case, in that Bailey Ridge ultimately refinanced its indebtedness to First Dakota through loans from another bank.

Also on March 24, 2011, Ruba executed a $500,000 promissory note in favor of First Dakota. Doc. 1-1; Doc. 123 at ¶ 15; Doc. 137 at ¶ 15. A First Dakota employee had told Ruba's attorney that the bank would not lend $5.6 million to Bailey Ridge without Ruba borrowing $500,000 to fund Bailey Ridge. Doc. 123 at ¶ 20; Doc. 137 at ¶ 20. The promissory note signed by Ruba was expressly governed by South Dakota law, entitled First Dakota to obtain attorney's fees and expenses from collection activity, and had a maturity date of December 30, 2011. Doc. 1-1. Also on March 24, 2011, Ruba entered into an agreement with Bailey Ridge where he agreed to "transfer to Bailey Ridge Partners, LLC and Bailey Ridge Partners, LLC will accept from Jerry Ruba $500,000 cash." Doc. 7-1. The $500,000 of cash came directly from First Dakota based on the promissory note Ruba signed. Ruba signed a disbursement request and authorization to First Dakota for payment of the $500,000 as a capital investment in Bailey Ridge. Doc. 128 at ¶ 16; Doc. 142 at ¶ 16.

Under a March 24, 2011 Agreement between Ruba and Bailey Ridge, Ruba received a 7.25% interest in Bailey Ridge in exchange for his $500,000 investment, and Bailey Ridge committed to buy out Ruba "starting in one-and-a-half to two years and it will take approximately five years to buy him out." Doc. 7-1. Under the Agreement, Ruba also transferred to Bailey Ridge and Bailey Ridge accepted from Ruba the $664,581.30 account received (that had originated as Maple Grove's debt to Ruba's parents but had been assumed by Ruba) "arising from the operation of hog confinements by Maple Grove Farms, LLC" an entity operated previously by Jack Grubb.

11

Doc. 7-1. Bailey Ridge then executed a promissory note in the amount of $664,581.30 with interest at 6.25% annually. Doc. 7-1.

The members of Bailey Ridge, on March 24, 2011, executed an Operating Agreement, which was signed by Ruba, Nafe, and Manthei personally; by Engle as president of Energy Systems, Inc., by Davis as president of Dover Development, LLC; and by Nicole Grubb as president of Grubb Family Limited Partnership. Doc. 138-30. The Operating Agreement reflected a $500,000 "capital contribution" by Ruba entitling him to 7.52% of the shares of Bailey Ridge. Doc. 138-30 at § 2.01. The majority owner of Bailey Ridge is Grubb Family Partnership, with a 62.07% share. Doc. 138-30 at § 2.01. Grubb Family Partnership in turn is owned by Jack Grubb, Nicole Grubb-Nearman, and Jason Grubb. Doc. 105 at 8. Jack Grubb was an original and apparently principal manager of Bailey Ridge. Doc. 138-30 at § 3.01.

Ruba acknowledges signing all of the agreements but felt pressured to do so on March 24, 2011. Ruba's attorney Murphy was not present on March 24, 2011, when the documents were signed. Doc. 123 at ¶ 25; Doc. 137 at ¶ 25. Ruba contends that he was not aware until March 24 that he would be signing a $5.6 million promissory note. Consistent with the terms of the Agreement between Ruba and Bailey Ridge, Ruba expected to be bought out of Bailey Ridge over time. Doc. 137 at ¶ 17. Ruba maintains, however, that Jack Grubb told him that Bailey Ridge planned to buy him out over a matter of weeks and that the only way he would get repaid on the $664,581.30 receivable was to go along with the refinancing. Doc. 137 at ¶ 27. Ruba further maintains that he understood from Jack Grubb that First Dakota loans were a short-term matter because a Small Business Administration loan was going to be funded within a short time of March of 2011. Doc. 137 at ¶ 31.

Ruba did not make payment to First Dakota on the $500,000 note by the due date of December 30, 2011. Instead, Ruba executed ten separate amendments extending the due date. Each of these amendments stated:

> All of the terms, conditions, and agreements contained in the original note are hereby continued in full force and effect and remain applicable to the indebtedness evidenced by this agreement. Any security agreements, including financing statements, pledges and chattel mortgages, securing the payment to the above mentioned original indebtedness, are also extended in accordance with the terms and provisions contained herein.

Doc. 130-8 at 1–10. The final loan extension included an additional provision:

> Borrower [Ruba] acknowledges that the current principal balance is $500,000. This does not include any accrued interest or other fees and charges.

Doc. 130-8 at 10. Ruba made some principal balance payments to First Dakota prior to June 25, 2015, but the bank gave notice of default on that date. Doc. 1-2. First Dakota then filed its complaint in early 2016.

Meanwhile, Ruba was not getting paid under his March 24, 2011 Agreement with Bailey Ridge on either the $664,581.30 promissory note or the buyout of his $500,000 interest in Bailey Ridge. On February 16, 2012, Ruba, Bailey Ridge, and the members of Bailey Ridge executed a Memorandum Agreement reaffirming the Bailey Ridge obligations to Ruba and requiring Bailey Ridge to pay Ruba for the interest accruing on Ruba's $500,000 promissory note to First Dakota. Doc. 138-12. Ruba makes no claim in this lawsuit based on the February of 2012 Memorandum Agreement.

On July 11, 2013, Ruba, Bailey Ridge, and the members of Bailey Ridge entered into a second Memorandum Agreement that superseded the February of 2012 Memorandum Agreement, excepting for certain paragraphs describing the responsibilities Bailey Ridge owed to Ruba. Doc. 7-3 at ¶ 3. This second Memorandum Agreement forms the basis of Count 2 of Ruba's second

amended third-party complaint, Doc. 105, and the terms of this Memorandum Agreement will be discussed below. Notwithstanding this second Memorandum Agreement, Ruba did not receive the $664,581.30 plus interest by the specified deadline date of January 5, 2014, from Bailey Ridge, nor payment of $500,000 for the loan Ruba had taken from First Dakota by the specified deadline date of January 5, 2014, from Bailey Ridge. Because Ruba was not getting paid, Ruba filed the third-party complaint and amendments thereto against Bailey Ridge and its members.

### C. First Dakota's Motion for Summary Judgment

This Court has diversity jurisdiction over First Dakota's claim against Ruba, because First Dakota is a South Dakota citizen, Ruba is an Iowa citizen, and more than $75,000 is at stake. Doc. 1; 28 U.S.C. § 1332. The promissory note executed by Ruba in favor of First Dakota expressly states that South Dakota law governs. Doc. 1-1. Ruba signed the note, signed ten extension agreements, including a final one reaffirming the $500,000 indebtedness, and has failed to pay. Docs. 1-1, 1-2, 13-8 at 1–10. Ruba directed the $500,000 to be paid to Bailey Ridge. Doc. 128 at ¶ 16; Doc. 142 at ¶ 16. Ruba received an ownership interest in Bailey Ridge as a result. In short, there is a contract, supported by valid consideration, a breach of the contract, and damages.

Under South Dakota law, the elements of a breach of contract claim are "(1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages." Bowes Constr., Inc. v. S.D. Dep't of Transp., 793 N.W.2d 36, 43 (S.D. 2010) (cleaned up); Guthmiller v. Deloitte & Toucher, LLP, 699 N.W.2d 493, 498 (S.D. 2005). The promissory note is the enforceable promise, failure to repay as specified in the promissory note and amendments is the breach, and First Dakota has resulting damages. Where, as here, Ruba is under a contractual obligation to pay a liquidated sum of money, the measure of damages for nonperformance is the sum of money itself with interest at the legal rate from the time when performance was due. Royal Indemn. Co. v. United States, 313 U.S. 289,

14

295–96 (1941); Richard A. Lord, <u>Williston on Contracts</u> § 66:96 (4th ed.); <u>see also</u> SDCL § 21-2-2 ("The detriment caused by the breach of an obligation to pay money only is deemed to be the amount due by the terms of the obligation with interest thereon."). First Dakota provided that calculation, Ruba did not object to the calculation, and this Court will look to First Dakota to update its calculation of what amount now is due under the promissory note.

To attempt to avoid summary judgment on First Dakota's claim, Ruba relies on the assertions in his counterclaim of fraud and an illegal tying arrangement under 12 U.S.C. § 1972. Ruba's fraud claim in the amended answer and counterclaim, though titled fraud, sounds more like negligent misrepresentation, including allegations that First Dakota had knowledge of Bailey Ridge finances and failed to share the information with Ruba, and that First Dakota failed to exercise reasonable care. Doc. 105 at 5. Ruba's allegations of fraud against First Dakota fail to meet the Rule 9(b) pleading standards discussed above in this Opinion and Order, but this Court is deciding claims involving First Dakota on a motion for summary judgment rather than on a motion to dismiss.

To state a claim for fraudulent misrepresentation under South Dakota law, Ruba would have to show: 1) that a false representation of a material fact was made by First Dakota; 2) that First Dakota knew the fact was not true or was made recklessly with no reasonable grounds for believing the fact to be true; 3) that the misrepresentation was made with the intent to induce Ruba to act upon on it; 4) that Ruba took action or refrained from taking action in reliance on the representation; and 5) that Ruba incurred damages from such reliance. <u>Larson Mfg. Co. of S.D. v. Conn. Greenstar, Inc.</u>, 929 F. Supp. 2d 924, 932 (D.S.D. 2013); <u>Estate of Johnson v. Weber</u>, 898 N.W.2d 718, 729 (S.D. 2017); <u>see also</u> <u>Taggart v. Ford Motor Credit Co.</u>, 462 N.W.2d 493, 499, 504 (S.D. 1990). During his deposition, Ruba admitted that he invested in Bailey Ridge because he wanted to recoup

a debt owed to him by Jack Grubb's entity Maple Grove and that he signed promissory notes to fund Bailey Ridge and had the old debt rolled into Bailey Ridge because Jack Grubb told him that it was the only way that Ruba would ever be paid. Ruba made the $500,000 investment in Bailey Ridge, expecting to get that money back in short order and to get paid the debt originally owed by Maple Grove. Ruba claims that Jack Grubb was the one who made material misrepresentations to him to induce him to take the $500,000 loan to invest in Bailey Ridge and contends that First Dakota failed to correct Jack Grubb's material misrepresentations and disclose financial information about Bailey Ridge. The fraud claim against Jack Grubb includes allegations of misrepresentations that Bailey Ridge was planning on an SBA loan and that Bailey Ridge would pay Ruba back quickly, as explained above. The only allegations of fraud made with particularity by Ruba are against Jack Grubb. First Dakota did not commit a fraud on Ruba by failing to correct statements that Jack Grubb allegedly was making to Ruba concerning such things as Bailey Ridge's intentions for an SBA loan or early payoff of Ruba. Evidence in the record establishes that Ruba and his attorney knew that Bailey Ridge was a new entity created to buy out of foreclosure Maple Grove assets, that there was insufficient liquid assets or cash for Ruba to get paid the debt Maple Grove and then Bailey Ridge owed him, that First Dakota was willing to finance Bailey Ridge but only if additional cash was infused and ultimately $500,000 was infused through Ruba, and that First Dakota was taking a first lien on Bailey Ridge assets and was not willing to release that security interest for Ruba to have a priority interest. Doc. 128 at ¶ 46; Doc. 142 at ¶ 46. Moreover, Ruba reaffirmed his $500,000 obligation to First Dakota through entry into ten separate extensions, including a tenth one that expressly restated his obligation for the indebtedness of $500,000. These extensions occurred at a time when Ruba would have been aware of any fraud in the March 2011 transactions or, for that matter, any alleged tying arrangement imposed by First Dakota. Under South Dakota

law, this is ratification by confirmation or adoption through signing a document acknowledging the existence of the contract and the debt. Aamot v. Eneboe, 352 N.W.2d 647, 650 (S.D. 1984); see also SDCL § 59-2-4; Staab v. Skoglund, 234 N.W.2d 45, 50–52 (S.D. 1975). First Dakota is entitled to summary judgment on Ruba's fraud counterclaim.

Count 2 of Ruba's second amended counterclaim alleges an illegal tying agreement under 12 U.S.C. § 1972. Ruba makes four factual allegations to support the existence of a tie: 1) First Dakota required Ruba to put up collateral to refinance Bailey Ridge's obligations; 2) First Dakota required Ruba to pay Bailey Ridge's debt obligations and Ruba had no obligation to do so; 3) First Dakota induced Ruba to use property as collateral for a bank loan for which he received no benefit; and 4) First Dakota set up a loan account for the benefit of Bailey Ridge when First Dakota knew that Bailey Ridge had no ability to repay the loan. Doc. 105 at ¶¶ 16–18.

To show an illegal tying arrangement, Ruba must demonstrate that First Dakota "imposed a tie, that the practice was unusual in the banking industry, that it resulted in an anticompetitive arrangement, and that it benefitted [First Dakota]." Mamot Feed Lot & Trucking v. Hobson, 539 F.3d 898, 904 (8th Cir. 2008) (citation omitted); Doe v. Norwest Bank Minn., N.A., 107 F.3d 1297, 1304 (8th Cir. 1997); Alpine Elec. Co. v. Union Bank, 979 F.2d 133, 135 (8th Cir. 1992). The first element of a tying claim is that the bank imposed a tie. Mamot Feed Lot & Trucking, 539 F.3d at 904. The purpose of the anti-tying provision of the Bank Holding Company Act, 12 U.S.C. § 1972, is to "prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." Swerdloff v. Miami Nat'l Bank, 584 F.2d 54, 58 (5th Cir. 1978) (citation omitted). However, the anti-tying provision "was not intended to interfere with the conduct of appropriate traditional banking practices or to prohibit banks from protecting their

investments." Highland Capital, Inc. v. Franklin Nat'l Bank, 350 F.3d 558, 565 (6th Cir. 2003) (cleaned up and citation omitted). A tying arrangement is one that involves on the first hand a "tying product" and on the second hand the "tied product." Davis v. First Nat'l Bank of Westville, 868 F.2d 206, 208 (7th Cir. 1989) (citation omitted). In a tying arrangement, the selling of one product is conditioned on the purchase of another different product. Akiki v. Bank of Am., N.A., 632 F. App'x 965, 969 (11th Cir. 2015). Such a practice decreases competition because "it enables an economically powerful seller of the tying product to coerce customers of that product into buying an additional product they do not want or would rather buy elsewhere." Davis, 868 F.2d at 208. In essence, the anti-tying provision of the Bank Holding Company Act brings the Sherman Antitrust Act into the banking industry "without requiring plaintiffs to establish the economic power of a bank and specific anticompetitive effects of tying arrangements." Parsons Steel, Inc. v. First Ala. Bank of Montgomery, N.A., 679 F.2d 242, 245 (11th Cir. 1982); see also Highland Capital, 350 F.3d at 565 (observing that, unlike the Sherman Antitrust Act, a plaintiff is not required to show "a bank's economic power or an anti-competitive effect to make out a claim under 12 U.S.C. § 1972"); Norwest Bank, 107 F.3d at 1305 ("[A] plaintiff in a § 1972 action need not show that a tie has anti-competitive effects."). For instance, a bank cannot condition extension of credit on a requirement that a "customer participate in the bank's bad loans to an unrelated customer." Palermo v. First Nat'l Bank & Trust Co. of Okla. City, 894 F.2d 363, 369 (10th Cir. 1990) (citing Nordic Bank PLC v. Trend Group, Ltd., 619 F. Supp. 542, 557 (S.D.N.Y. 1985)).

In briefing, Ruba refines his tying contention by arguing that the tie is between the $5.6 million loan to Bailey Ridge and the $500,000 loan separately to Ruba, in that First Dakota would not have loaned $5.6 million if Ruba had not also committed to the $500,000 loan. Doc. 141 at 12. This, however, is not the sort of tying arrangement that § 1972 is designed to punish. Unlike in

Nordic Bank, for instance, Ruba was not forced to participate in First Dakota's bad loans to an unrelated customer. Ruba and Bailey Ridge were hardly unrelated customers, in that Ruba used the $500,000 borrowed from First Dakota to purchase an ownership interest in Bailey Ridge. Indeed, Ruba became a customer of First Dakota as a result of negotiations involving Ruba's brother-in-law Jack Grubb over redemption of hog confinement properties of Maple Grove being foreclosed upon because Ruba was seeking to preserve and have transfered to Bailey Ridge an unsecured obligation of Maple Grove to pay Ruba in excess of $664,000.

Even if such an arrangement were considered to be a tie, Ruba would have to show that the practice was unusual in the banking industry. Mamot Feed Lot & Trucking, 539 F.3d at 904. It is not unusual for a bank to require owners of a closely held corporation or partnership borrowing money to sign promissory notes, personal guarantees, and security agreements or mortgages. It likewise would not be unusual in the banking industry to loan money to a person to buy into a closely held company or partnership, which is what Ruba did with the $500,000 from his personal promissory note executed in favor of First Dakota. See Alpine Elec. Co., 979 F.2d at 135–36 (8th Cir. 1992); Bieber v. State Bank of Terry, 928 F.2d 328, 330 (9th Cir. 1991); see also New England Co. v. Bank of Gwinnett Cty., 891 F. Supp. 1569, 1575 (N.D. Ga. 1995) ("Conditioning the extension of credit on measures designed to insure that the bank's investment is protected is well within traditional banking practices, and is not the kind of unusual or anti-competitive practice that gives rise to a BHCA cause of action.").

Moreover, Ruba would have to show that the result of the challenged tie was an anti-competitive arrangement. Mamot Feed Lot & Trucking, 539 F.3d at 904. Ruba has presented no argument for how First Dakota's actions were anti-competitive. Ruba could have sought a $500,000 loan from a different bank to buy into and fund Bailey Ridge. Ruba indeed could have

19

chosen not to sign any of the agreements in March of 2011, although it may have cost him any hope of collecting the more than $664,000 that Maple Grove owed to Ruba. In sum, First Dakota is entitled to summary judgment on the counterclaim for a tying arrangement. Ruba has no viable counterclaim or defense as a matter of law to First Dakota's breach of contract claim based on the promissory note.

### D. Summary Judgment on Claims in Second Amended Third-Party Complaint

#### 1. Count I – Breach of Agreement Against Bailey Ridge

Count 1 of the second amended third-party complaint alleges breach of agreement by Ruba against Bailey Ridge. Doc. 105. This count references the March 24, 2011 Agreement and presumably relates to the failure to buy Ruba out of his $500,000 interest in Bailey Ridge obtained by Ruba through the $500,000 First Dakota loan. Neither Ruba nor Bailey Ridge filed a motion for summary judgment on Count 1.

#### 2. Count 2 – Breach of Memorandum Agreement

In Count 2 of the second amended third-party complaint, Ruba contends that Bailey Ridge, Davis, Nafe, Engle, Nearman, Jason Grubb and Manthei (but strangely not Jack Grubb or Grubb Family Partnership) owe damages for breach of the second Memorandum Agreement dated July 11, 2013. Doc. 105 at ¶¶ 25–29. Ruba's argument is that the members personally guaranteed Bailey Ridge's obligation to Ruba by entering into this Memorandum Agreement. However, the Memorandum Agreement does not, as a matter of law, lend itself to such an interpretation. See Pillsbury Co., Inc. v. Wells Dairy, Inc., 752 N.W.2d 430, 435–36 (Iowa 2008) (discussing principles of contract interpretation under Iowa law).

The July of 2013 Memorandum Agreement has three sections and refers to Ruba as "JERRY." The first section is entitled "Bailey Ridge Obligations" and states in full:

A. The investment JERRY has in BAILEY RIDGE as identified in the Agreement dated March 24, 2011, in the amount of $664,581.30 bears interest at the rate of 6.25% per annum. BAILEY RIDGE will pay JERRY his principal and accrued interest in full as of January 5, 2014, with payment directly to JERRY RUBA.

B. BAILEY RIDGE shall pay JERRY all principal and accrued interest on that certain $500,000 loan made individually by JERRY with First Dakota National Bank, Vermillion, South Dakota, by January 5, 2014.

Doc. 7-3.

The second section of this Memorandum Agreement has Ruba's obligations set forth in

sections A, B, and C as follows:

A. JERRY acknowledges that barring breach of the terms and conditions of this Memorandum Agreement and the initial Agreement dated March 24, 2011, by BAILY [sic] RIDGE and/or NOTE SIGNERS, JERRY will not commence any litigation or otherwise pursue any claims against BAILEY RIDGE arising out of the obligations described herein at any time prior to January 5, 2014. This accommodation is made by JERRY for benefit of BAILEY RIDGE, NOTE SIGNERS and the company lender.

B. JERRY also agrees to sign such document as the lender requires to extend the financing of BAILEY RIDGE through January 5, 2014.

C. JERRY understands that a source of funds that can be used to pay the obligations described above may come from investors who invest in BAILEY RIDGE and JERRY shall cooperate to any reasonable extent necessary in BAILEY RIDGE securing such investors in order to make payout to JERRY RUBA.

Doc. 7-3. Paragraph D of the second section is the provision that mentions individuals by name

and states the following:

D. Once BAILEY RIDGE has performed all of its financial obligations under this Agreement, JERRY and LYNNE RUBA shall execute a release of FLOYD C. DAVIS, VERLYN NAFE, PAUL ENGLE, NICOLE GRUBB-NEARMAN, JASON GRUBB, FRANK MANTHEI, PAT MANTHEI, JACK GRUBB and DIANA GRUBB and FLOYD C. DAVIS, VERLYN NAFE, PAUL ENGLE, NICOLE GRUBB-NEARMAN, JASON GRUBB, FRANK MANTEHI [sic], PAT MANTHE [sic], JACK GRUBB and DIANA GRUBB shall execute a Release of JERRY and LYNNE RUBA. Upon payout in full of the obligations from BAILEY RIDGE to JERRY RUBA, mutual reciprocal releases shall be executed and delivered to each party.

Doc. 7-3. Obviously, this Section 2.D. does not contain personal guarantees of the Bailey Ridge debt to Ruba. Rather, this provision requires execution of mutual releases, once Bailey Ridge pays Ruba what Bailey Ridge owes him.

The third and final section of this Memorandum Agreement states:

> This Memorandum Agreement is in substitution for and in replacement of, the Memorandum Agreement among the same parties dated February 16, 2012, and supercedes [sic] the Agreement in all respects EXCEPTING Paragraphs 1A-B-C-D thereof.

Doc. 7-3. The first Memorandum Agreement dated February 16, 2012, in Paragraphs 1.A., B., C., and D. contained obligations of Bailey Ridge. There was no personal guarantee in the February of 2012 Memorandum Agreement. Thus, the second Memorandum Agreement contains no provision where the members of Bailey Ridge personally guarantee to Ruba the obligations of Bailey Ridge.

Ruba's argument about a personal guarantee is based on a recital clause of the second Memorandum Agreement. That recital clause indicated that the parties were "desirous of extending financing for Bailey Ridge, enabling Bailey Ridge to obtain an inventor [sic] or investors and make payout to member, Jerry Ruba;" and that certain assurances were required "from Bailey Ridge, the NOTE SIGNERS and Jerry [Ruba] in reference to extending loans and making assurances for future financing to Bailey Ridge." Doc. 7-3. These recital clauses do not say that the individual members, by entering into this Memorandum Agreement, were guaranteeing or making themselves personally responsible for Bailey Ridge's unpaid debt to Ruba. Because the terms of the second Memorandum Agreement clearly do not support the claimed contractual obligation of individual members to pay Ruba when Bailey Ridge could not or did not, all of the individual Third-Party Defendants are entitled to summary judgment on Count 2 of the second amended third-party complaint. See Fischer Controls Int'l v. Pharmacia Corp., 752 N.W.2d 31, 2008 WL 373636, at *5 (Iowa Ct. App.

22

2008) ("A preliminary recital, which is an explanation of the circumstances surrounding the execution of the contract, does not become a binding obligation unless so referred to in the operative portion of the instrument." (citation omitted)); 17A Am. Jur. 2d Contracts § 373 (2d ed. updated August 2019) ("'Whereas clauses' are generally viewed as being merely introductory and since recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement." (footnote omitted)).

### 3. Count 3 – Breach of Promissory Note

Ruba previously filed a motion for partial summary judgment on Count 3 of the second amended third-party complaint concerning the promissory note entered into by Bailey Ridge in the amount of $664,581.30, plus interest. This Court previously granted that motion for partial summary judgment for Ruba and against Bailey Ridge.

### 4. Count 4 – Fraud and/or Material Misrepresentation

This Court already in this Opinion and Order has discussed this claim in the context of the motions to dismiss. At oral argument and in briefing, Ruba made arguments beyond what was alleged in the second amended third-party complaint about conduct by Jack Grubb, including that he allegedly used the proceeds of Ruba's $500,000 investment in Bailey Ridge for personal gain. Indeed, material of record indicates that Jack Grubb received $55,000, and Nicole Grubb-Nearman received $35,000 out of the proceeds, and that some money went to what may have been non-Bailey Ridge debt. In short, Ruba may have a viable fraud claim against Jack Grubb, but in this case he appears not to have met the Rule 9(b) pleading standards. For the reasons explained above, this Court would grant Ruba leave to amend the fraud claim as against Jack Grubb, although that claim, for reasons explained below, is to be litigated in Iowa state court.

### 5. Count 5 – Minority Oppression

In Count 5 of the second amended third-party complaint, Ruba claims minority oppression against Bailey Ridge and its majority owner Grubb Family Partnership, which in turn is owned by Jack Grubb, Nicole Grubb-Nearman and Jason Grubb. Iowa law governs this claim, as Bailey Ridge is an Iowa limited liability corporation and Ruba, Jack Grubb and Nicole Grubb-Nearman all reside in Iowa. In Baur v. Baur Farms, Inc., 832 N.W.2d 663 (Iowa 2013), the Supreme Court of Iowa adopted "a reasonableness standard for the adjudication of minority shareholder claims of oppression in Iowa." Id. at 673. The Baur decision read Iowa's Business Corporations Act to include "the principle that every shareholder may reasonably expect to share proportionally in a corporation's gains." Id. Whether oppression of a minority shareholder has occurred is analyzed in the context of the fiduciary duties owed from the majority shareholders to the company and its other shareholders. Id. at 673–74. The Baur court determined a case for shareholder oppression existed in a closely held corporation where the company having the corporate financial resources to do so, failed to satisfy the reasonable expectations of a minority shareholder by paying no return on shareholder equity while declining the minority shareholder's repeated offers to sell shares for fair value. Id. at 674.

Ruba's claim for minority oppression differs substantially from the one in Baur. Ruba in the second amended third-party complaint alleges minority oppression in that he was not kept informed of operations or the financial status of Bailey Ridge, not notified of owner meetings, not involved in vital decisions, and not allowed to provide input or even be informed of decisions, including the decision of Bailey Ridge to file for bankruptcy protection after this lawsuit started. Doc. 105 at ¶ 45. After oral argument on the motion, Ruba and the Grubb Defendants filed additional arguments disputing whether minority oppression is a cause of action that exists in the context of Iowa limited liability corporations. Docs. 152, 154. Indeed, the Grubb Defendants have

made a motion to file a supplemental brief, and Ruba has filed a resistance to that motion, through which the Grubb Defendants and Ruba press conflicting arguments on the scope of the Iowa cause of action for minority oppression.

There is very little law on the breadth of the Iowa minority oppression cause of action. For the reasons explained in the next section, this Court believes it appropriate to defer a decision on whether Ruba has a viable claim for minority oppression to an Iowa state court, instead of having a federal district court in South Dakota predicting how the Iowa court might rule on the possible extension of the minority oppression cause of action to the situation in this case.

## IV.    Limits of Supplemental Jurisdiction

This Court had diversity jurisdiction over the original claim between First Dakota and Ruba because the case involved over $75,000 and the parties are from different states.[4] Ruba then sued the Third-Party Defendants under Rule 14(a), which allows a defendant like Ruba to sue another as a third-party defendant "who is or may be liable" to him for all of First Dakota's claims against Ruba. Fed. R. Civ. P. 14(a)(1). This Court has supplemental jurisdiction over these third-party claims if they "form part of the same case or controversy" as First Dakota's claim against Ruba even though there is a lack of diversity of citizenship between Ruba and Third-Party Defendants. 28 U.S.C. § 1367. "Claims within the action are part of the same case or controversy if they derive from a common nucleus of operative fact." Myers v. Richland Cty., 429 F.3d 740, 746 (8th Cir. 2005) (cleaned up and citation omitted). "A plaintiff's claims derive from a common nucleus of

---

[4] The general rule is that courts look to the time of filing to assess diversity of citizenship, regardless of when the jurisdictional challenge is raised. Grupo Dataflux v. Atlas Glob. Grp., 541 U.S. 567, 570–71 (2004). Under this rule, "a change of parties, by addition, substitution, or elimination, also will not divest the court of diversity jurisdiction if the nature of the action remains the same, if the court finds that no collusion is involved in the conduct of the parties, or if the change is not an obvious attempt to evade the rule of complete diversity." 13E Arthur R. Miller, Federal Practice and Procedure § 3608 (3d ed. updated August 2019) (footnotes omitted).

operative fact if the claims are such that he would ordinarily be expected to try them all in one judicial proceeding." OnePoint Sols., LLC v. Borchert, 486 F.3d 342, 350 (8th Cir. 2007) (cleaned up and citation omitted).

Now that this Court is granting summary judgment to First Dakota, this Court has the discretion to retain jurisdiction over the third-party claims. Most courts agree that supplemental jurisdiction is not lost if the original action is resolved before the third-party claims are decided. Hill v. Rolleri, 615 F.2d 886 (9th Cir. 1980); 6 Arthur R. Miller et al., Federal Practice and Procedure § 1444 (3d ed. updated August 2019); see also Thomas v. United Steel Workers Local 1938, 743 F.3d 1134, 1141 (8th Cir. 2014) ("If the district court dismisses every claim over which it had original jurisdiction, the court maintains its broad discretion to exercise supplemental jurisdiction over any remaining state-law claims."). In Hill, the jurisdiction-conferring parties settled their claims during trial, leaving only the claims between the non-diverse defendants and the third-party defendant. Id. at 889. The Ninth Circuit held that federal jurisdiction survived the settlement of the main action upon which diversity jurisdiction depended. Id.

Of course, "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). "[W]hen a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually will point toward declining to exercise jurisdiction over the remaining state law claims." In re Canadian Imp. Antitrust Litig., 470 F.3d 785, 792 (8th Cir. 2006) (cleaned up and citation omitted). "The factors a court should consider in determining whether to exercise jurisdiction over pendent state law claims are judicial economy, convenience, fairness, and comity." Wilson v. Miller, 821 F.3d 963, 970 (8th Cir. 2016). There are instances where a case has progressed so far that retention of supplemental jurisdiction serves

interests of judicial economy, convenience, fairness, and comity. Thomas, 743 F.3d at 1141 (upholding a district court's decision to continue to exercise supplemental jurisdiction "given the substantial amount of time and judicial resources expended in the case"); 6 Arthur R. Miller et al., Federal Practice and Procedure § 1444 (updated August 2019) ("[I]f there has been a substantial commitment of the court's or litigant's resources prior to the termination of the main claim, dismissal of the Rule 14 claim will run counter to the rationale justifying supplemental jurisdiction and third-party practice.")

In this case, it does not serve the interests of justice for this Court to retain supplemental jurisdiction over the possible fraud claim against Jack Grubb and the minority oppression claim. To begin with, if Ruba wants to press a fraud claim against Jack Grubb, he will have to amend the claim and, in fairness, Jack Grubb would be entitled to depose Ruba again on the amended fraud claim, if Jack Grubb desires to do so. Although discovery has progressed in this case, that discovery readily can be used in any Iowa state action. Thus, there is little judicial economy achieved by this Court retaining supplemental jurisdiction over the remaining claim of minority oppression and the possible amended fraud claim against Jack Grubb. As for the convenience factor, Ruba, the Grubb Defendants, and Bailey Ridge all lack ties to South Dakota and are instead located in Iowa.[5] The witnesses to any potential fraud claim or minority oppression claim primarily are in Iowa as well. Trial and further court proceedings in South Dakota seem inconvenient to the remaining parties. Similarly, there is no unfairness in allowing Iowa litigants to press claims under Iowa law for fraud and minority oppression in Iowa state court. Comity concerns militate strongly toward litigation of the minority oppression claim in Iowa, given that the minority oppression cause of action is a

---

[5] One of the owners of Grubb Family Partnership—Jack Grubb—now lives in Colorado, but is from Iowa.

developing legal doctrine in Iowa and the parties dispute whether the doctrine even extends to a limited liability corporation like Bailey Ridge. See also 28 U.S.C. § 1367(c)(1) (explaining that courts may decline to exercise supplemental jurisdiction over a claim if it "raises a novel or complex issue of State law"). Thus, the balance of interests points toward declining the exercise of jurisdiction over the remaining state law claims.[6] In re Canadian Imp. Antitrust Litig., 470 F.3d at 792.

## V.    Order

Therefore, it is hereby

ORDERED that the motions to dismiss Defendants Engle, Nafe, and Davis, Docs. 111 and 113, are granted and Defendants Engle, Nafe, and Davis are dismissed from Count 4 of the second amended third-party complaint. It is further

ORDERED that the motion to dismiss Bailey Ridge and the Grubb Defendants, Doc. 115, is granted with respect to Jason Grubb, Nicole Grubb-Nearman, Grubb Family Partnership, and Frank Manthei. Ruba may chose to proceed with a fraud claim against Jack Grubb and Bailey Ridge and a shareholder oppression claim against Bailey Ridge and Grubb Family Partnership in Iowa state court now or within 30 days of dismissal without prejudice of those claims by this Court consistent with 28 U.S.C. § 1367(d). It is further

ORDERED that First Dakota's motion for summary judgment, Doc. 126, is granted as to its complaint and as to Ruba's counterclaim. First Dakota should file within 14 calendar days of this Opinion and Order a calculation of how much is due under the promissory note signed by Ruba, and Ruba has 14 days thereafter to file an objection, if any, to the calculation. It is further

---

[6] This Court, however, concludes that the balance of interests favors ruling on the summary judgment motion as to Count 2 and the motions to dismiss fraud claims to prevent re-litigation and briefing anew by the Third-Party Defendants on those matters.

ORDERED that the motion for summary judgment by the Grubb Defendants, Doc. 121, is granted with respect to Count 2 of the second amended third-party complaint. Count Two of the second amended third-party complaint thus is dismissed as to Frank Manthei, Nicole Grubb-Nearman, and Jack Grubb and in its entirety as to Frank Manthei and Nicole Grubb-Nearman. It is further

ORDERED that the motion for partial summary judgment of Defendants Nafe, Engle, and Davis, Doc. 131, is granted as to Count 2 of the second amended third-party complaint and there being no remaining claims against Nafe, Engle, or Davis, that judgment enter in favor of those Defendants and against Ruba on the claims of the second amended third-party complaint. Davis has twenty-one days within which to notify this Court if he intends to dismiss the counterclaim against Ruba. It is further

ORDERED that the motion for leave to file supplemental brief, Doc. 151, is granted and that the Court has considered both the supplemental brief and the resistance to the supplemental brief arguing about whether minority oppression applies to limited liability corporations under Iowa law. It is finally

ORDERED that upon the determination of the amount of the judgment for First Dakota, this Court will then dismiss this case without prejudice as to Counts 1, 4 (as it relates to Jack Grubb and Bailey Ridge) so that Ruba can pursue a fraud claim in Iowa state court if he wishes, and Count 5, and will enter final judgment on Count 3 against Bailey Ridge and in favor of Ruba as well as judgment of dismissal on other claims.

DATED this 30th day of September, 2019.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE